I'll call the case of Fernandez v. Bailey. Jennifer Arlotta Jennifer Arlotta with Holland and Knight on behalf of Mr. Roque Fernandez, the appellant in this case and the father of the children. This is a case about a repeat offender under the Hague Convention. This case is unique in that the mother ignored a prior federal court order and for a second time abducted the children and took them out of Panama, their habitual place of residence, despite a no-exit order in place. The father submit that the No-exit order conveyed to the wife or to the mother? Your Honor, the mother testified at trial that she did not know about the exit order. However, I know it was directed at the immigration authorities because that's where, right? Yes, Your Honor. Yeah, I just didn't know. One could, I suppose, reach an inference that that was true if one were to accept the fact that she had this fake letter because that would explain it, that she anticipated being stopped at the border. Your Honor. That would have to show some consent. Yes, Your Honor. In this case, in 2009, the mother abducted the children a first time and brought them to Missouri and a federal court told her that she had to return to Panama so that the custody proceedings can return. Again, this case is unique because the mother knew that she was not allowed to leave the country and she left while the custody proceedings between her and Mr. Roque Fernandez were ongoing for the children. How soon after he learned, your client learned, that they were in Tampa, did he file his lawsuit? Your Honor, he found out that the children were in Tampa, I believe, a month before filing his petition. It took a long time for the authorities to ... Yeah, it was the State Department and he didn't have a private lawyer at that point doing the searching, right? No, Your Honor. My client's financial position would not allow him to be represented otherwise than pro bono. He did not have an investigator until then. He first searched the children in Panama because of the no exit order. He believed that the children could not have left the country. He testified in great length that he was looking for the children in Panama for almost 11 months until the Panamanian authorities told him that the mother had crossed the border. That's when he made the application to the State Department as a central authority under the convention. Yes, Your Honor. It took almost a year for the State Department to be able to locate the children in the United States. The other question I have about him is under what circumstances could he and will he be able to come to the states if the case stays here, if the district court is affirmed? He's not able to come into the country right now because of a prior conviction that occurred, I think, when he was a teenager. Is that correct? That is correct, Your Honor. How old is he now, roughly? He's roughly almost 40 years old and this conviction happened when he was 16. 16. Our understanding, Your Honor, is that the visa will be difficult to obtain. Without a judgment from a court, we cannot apply for the visa as of right now, but that was the information that was told to us by an immigration attorney. That's one of the reasons that the custody proceedings should be resumed in Panama because ... Our position is that this was because she abducted them the second time, that this is a flagrant abduction, more flagrant than usual, and that for that reason, the convention ought to be honored in full force and she ought to be returned, notwithstanding the fact that more than a year has passed and therefore, they are entitled to the well-settled defense or exception. Correct? Our main position ... That is correct, Your Honor. Our main position is regardless of whether the children are well-settled, this court has authority to return the children and because of the mother's conduct here that is egregious, the children should be returned regardless of whether they are well-settled. Your primary argument is that they were not well-settled here. It's also true, Your Honor. That is an alternative argument because the trial court, in our opinion, has mistakenly taken into account the factors, not all of the factors that we think should have been taken into account, including the children's ties to Panama. That raises an interesting question because the Lozano case in the Second Circuit did not list that as one of the factors and that seems to be a case that has been followed in various courts, but not in the Fifth Circuit. The Fifth Circuit has a different rule. The Fifth Circuit says that the circumstances in the country of habitual residence should be considered in the Hernandez case. Your Honor, two points on that. First, Justice Alito, in his concurring opinion in the Lozano case, does state that the ties to the habitual residence should be taken into consideration and we urge you to adopt that concurring opinion. In addition to that, there is, and I'll be asking your adversary about this, there is State Department language to that opinion and that in Hernandez, the court said that that's entitled to deference. Your Honor, that is absolutely correct. The State Department has stated that the well-settled exception should be considered in light of the evidence concerning the children's contact with and ties to the state of habitual residence and we do urge you to take that into consideration. That's because Abbott, Abbott against Abbott, says that one should defer to the State Department on these matters. Your Honor, that is correct. And the children's ties... If we're looking to not only the mother's conduct the second time around, but also the children's ties to the other place, Panama in this case, do we take into account the fact that your client misbehaved as well, maybe not to the same degree? Your Honor, I'm... Are you referring to what happened in... The fact that he, according to the district court, that he, contrary to the Panamanian court's order, took them for a period of two to three months and enrolled them in a school somewhere else without notice to the mother? Your Honor, I don't think that that's the concern that this court should have because those are concerns that the Panamanian courts have taken into account and are going to take into account once the custody proceedings resume. The parties clearly had a contentious relationship and there are ongoing custody battles since 2009. The father testified that the mother, for example, did not bring the children to the visitation place multiple times. I know, and she testified completely to the contrary and the district court didn't make a finding one way or the other. That is correct, Your Honor. However, the fact is that she knew that she was not allowed to take the children out of the country. She knew that the custody proceedings should be resumed in Panama and she did it anyways a second time. That order denying the return of the children to Panama contravened every single goal that this convention has. The convention's goal is to deter future abductions, to allow the home country to make its own custody determination, and to favor the prompt return of the children. The result here is simply unconscionable. Regardless of whether the children are well settled, they should be returned to Panama. But if you look at the egregiousness of the conduct, don't you risk eliminating the exception, the well settled exception, or the well settled defense, whatever you may want to call it? I mean, at some level, I speak only for myself, at some level, whatever egregiousness test you may be able to have has to stop in favor of the well settled defense or exception, right? Because otherwise, you're using a common law, for lack of a better term, egregiousness test to bypass and vitiate a statutory or a treaty based defense or exception. So, I don't think it can be the case that if the conduct is really egregious, then you wipe out the defenses, right? That is correct, Your Honor. Not in all times. How do we write this in your favor, then? If we were to write an opinion in your favor on this issue, what do we say about when the well settled defense or exception gives way to the egregiousness of the removing parent's conduct? Well, Your Honor, in this case, I would say that it's the fact that the mother took the children twice out of the country. She essentially used her first case in 2010 as a playbook on how to win the system. And that alone should warrant the return of the children. Now, I do agree that the well settled exception is an exception and should apply, and we don't deny that the children have been here for a few years, and that should be taken into consideration. However, that is not the only factor here. First, the mother's concealment efforts should be taken into consideration, the fact that she took them twice out of the country, and the fact that the children have ties to Panama, and that factor was not taken into consideration by the district court at all. The children have lived most of their lives in Panama. They have family there. They have a father there that hasn't been able to speak to them since 2013 because of the mother's conduct. They have extended family. They've done very well in Panama. There is nothing in the record that would suggest that the children would not do just as well as Panama than in the United States. This is not a situation, I take it, where there is some sort of trauma associated with returning to the home of the father, which was the case in Blondin and also, I believe, to some extent, in Lozado. There was great concern on the part of the child in that. No, Your Honor, there is nothing in the record that would establish that the children . . . Yes, in terms of family ties, the mother's family is in Alabama, correct? Yes, Your Honor. And extended family. And in Panama, what's the situation? Your Honor, my understanding is that the father has a large family and that the grandmother, for example, used to take care of the children and had a relationship with the children. He has now a wife and other children, so . . . Does the grandmother live in that house, in the same house, do we know, or . . . Yes, Your Honor. Yes, Your Honor. And that's one of the reasons why the children were doing well before. They had all these ties to Panama. And the district court completely overlooked those ties. In conclusion, first, regardless of whether the children are well settled, we ask you to return the children so that the custody proceedings can resume. Thank you. May it please the Court, Ashley Taylor for the Appellee, Christy Bailey. If I may begin with a comment from counsel that this Court has authority to return the children despite a finding that the well settled exception applies. I do believe this Court has that authority. I think the question is what's the standard of review on that authority? And if you look to the Custodio case from the Eighth Circuit, in that case it had to do with a mature objection. But what the Court said in that case is a district court retains discretion not to apply an exception, as the Court did not hear. Its decision either way is reviewed only for an abuse of discretion. So in this case, over a three-day hearing, over three days of taking evidence, the district court applied them to the factors, used the case of Lops from this circuit, as well as the Supreme Court case of Lozano, in coming up with which factors to apply the factual findings to, and found that the children were well settled. She then went on to say, I understand that despite this finding, I have the discretion to order repatriation anyways. And she cited Lozano in saying, I'm going to choose not to do that because the goal of the Convention is not pursued at any cost. And in this case, she found that the interests of the children outweighed the other interests of the Convention. Isn't one concern, my colleague on the bench here asked the question of whether or not the egregious actions of the mother would somehow impair the exception. And I have another question of a similar nature. And that is whether, if the exception is applied in a case where there is no real problem with sending the kids back in terms of their physical well-being, or their mental well-being, or anything of that sort, doesn't the exception then kind of weaken the treaty? I mean, isn't this a safe harbor now? Couldn't it be a safe harbor for abductors if they can conceal the children, keep them away, make them difficult to find, and get them into a situation where they can argue they're well settled? Isn't that an invitation, basically, to do an end run around the treaty? Yes, Your Honor. And a point that you just made is the word concealment. What? The word concealment. It's either concealment or not. But there's no doubt that the father acted as quickly as the father could, given the information that the father had at any given time. She wasn't about to call up the father and say, I've got them in Tampa now. Do something. So she didn't do that. But it took him a while to find them. In these circumstances, where an abductor can do that and have the clock run for more than a year to get the defense, but then after that to help establish it, doesn't that weaken the effectiveness of the convention, which is designed to return children promptly, according to the findings of fact, according to the purpose in the treaty and also in the legislation? Yes, Your Honor. However, as stated by the Fourth Circuit in Alcala, with that in mind, then why would the exception ever apply? Because for the exception to ever come into, to be able to be used, you have to first establish a prima facie case, which means there's been wrongful removal. So there's been this bad act. So if that was the case, then why did the drafters of the convention even put that exception? I've noticed that in a lot of these cases where return has been ordered, and even within the, return has been denied, and even within the one-year period, there's been a huge, not a huge problem, but a problem with returning the child, because the environment that is there, or because of the trauma that the child has felt in the past, and so forth, which doesn't seem to exist here. Correct me if I'm wrong. Well, according to the mother, it does exist, actually. The court, as far as the grave risk exception, the grave risk... There wasn't a finding by the district judge to that effect. No, there was not, Your Honor. As far as the circumstances in Panama, if you review the record, there's actually very little evidence regarding the circumstances in Panama. The only evidence that I could find was the father testifying of who he lives with. So as far as the ties to Panama, the father did not present evidence for the court to rely on those ties to make a finding as to whether returning to Panama would be harmful or not. Do you agree that the circumstances in Panama are relevant to the consideration of the well-settled exception? I think that the totality of the circumstances is what you look at. I think it could be a relevant factor, depending on the case. Hernandez? Yes, Your Honor. Tell that. Yes, Your Honor. However, I think that Lozano says the most important factor is the children's connection to their new environment. So you take into account the security in the new environment, the permanence in the new environment, and the stability in the new environment. And by doing that, you go into the various factors of, for example, in this case, are the children attending school? The court did find that the mother did not conceal the children. She had them registered in their names. She came to the Tampa Bay area. But the father didn't. I mean, at the same time, the district court found that the father was diligent in looking for them. I'm not sure that's the word she used. But I mean, she said, Judge Covington said he had not abandoned his parental responsibilities and seemed to acknowledge that he was busy looking for them. Yes, Your Honor. But she did say that she was concerned with his timeline. Because while I understand that counsel said he doesn't have the financial resources he had, multiple attorneys in Panama, and the mother was registered with the DMV. The mother was registered. She filed her tax returns. This is not a case where she was moving the children around, and it was hard to find them. Well, but I mean, how do you know where to begin looking? It's the whole United States. Yeah, how do you know where to begin looking? And so he never reached out. There's never been evidence presented that he even emailed the mother or had anybody email the mother where she was. Her email address, she testified, and it was unrefuted. Her email address never changed. And not once did we see correspondence saying, where are you? Did she email him? No, Your Honor. Where they were? No. Whether she intended to keep them concealed, she was not going to help him find them, right? So one of the comments by opposing counsel is that when she left, she knew she could not leave. And there was not a finding by the court on that. Well, there's a forged letter. Is there not? Actually, the court stated, while she did not put in her written findings, the court stated on Volume 3, page 55 of her ruling that she's going to find that she did not know about the letter, that Ms. Benson did not know about the letter. No, no, no, not the letter that was obtained by the father with immigration. But didn't she present the letter upon her exit to say that the father had agreed? That's the same letter. Okay, and what did the district court say about that? They said right before she asked me to give my closing, she said, I'm going to find that she did not present that letter, and I need to pull the record to give her the exact language. But she did say orally she said that? She said, I'm going to say. That was her statement. I'm going to say that she did not present that letter. Did that find its way to the written findings? She did not put it on the written order. No, she did not. Okay. I missed that then. I didn't see that comment. It's on page 55, line 25, and then it goes into page 26. Going back, if I could, to the well-settled exception. Yes, sir. Isn't it really driven by the idea of where the children in terms of until the custody is worked out, where the children can be in a safe, productive, loving environment? Isn't that really the – and that's why you balance. If you take the Hernandez case, you look at the home country as well as the new country to make that kind of assessment. And Lozano focuses – Because – if I can just finish right here. Because the scales really are tipped in favor of return by this whole convention system, isn't it? Yes, Your Honor. However, Lozano comes in and says the well-settled exception's purpose really is the new environment. It's not tipping back from the old environment to the new environment. That's – so there's a difference in the courts. Lozano's the Supreme Court. Hernandez comes out a little differently. Right, but Lozano went up to the Supreme Court last year. Or, sorry, I believe 2014. So with that said, I think the Supreme Court has – They were looking at other questions too. Weren't they – that court – Yes, Your Honor. Whether the exception applied and so forth. Yes, Your Honor. I think the overwhelming cases on the well-settled exception, including the Alcala court from the Fourth Circuit, have focused on that it's supposed to be balancing the children's current environment and how they're doing in their current new environment. And I think it comes down to what harm is going to be got on the children by removing them again, by taking them when they've now been settled. To assess what harm that might be, apart from having to pay for a plane ticket and fly for two hours, that would sort of invite consideration of what the situation would be in Panama. I know. I think that the harm is focused on taking a child who has established deep connections to a current environment, which is why I believe the year is important, has established those connections by taking the child and removing them again. Regardless of what the circumstances are at home, you are going to emotionally disturb that child. Take into consideration, if we're looking at sort of equities of the situation, the fact that your client removed them twice prior to this is not relevant in some way? I do not think it's relevant because I think it's a— In terms of upsetting the kids and moving them to a new place? I do think that that's relevant in the sense of upsetting the kids. But the problem is once they become well-settled, once that year passes, the purpose is to, frankly, not do more harm to the children. And the court is supposed to come in and weigh whether doing more harm to the children outweighs pursuing the goals of the convention. And in this case, the court shows that the well-settled exception applied. There was no factual findings that are clearly erroneous. She applied the findings to the factors, and then she chose to exercise her discretion— to not exercise her discretion and not send them back. She very well could have, but I think that was the district court's deference to do that or not do that based on the evidence in front of her. Let me ask you a general question. The language of the convention uses the words, now settled in its new environment. Where did the well-settled part of it come from? I believe through case law, yeah. Do you know where? No, I do not. I do not know the first—I don't know the first time it came out, but it's been used continuously throughout the different circuits. Do you think that makes a difference, or do you think it's just nomenclature, that it's just a descriptive term, but it really does, through the totality of the circumstances approach, try to do justice to the language of the convention itself? I think it's trying to do justice because I think the term that is really important is the settled. Whether it's now or well, it's just whether the children are settled, whether they've made these connections that do have to be supported by the evidence, saying that there are multiple connections to their new environment. But I think that the point of the exception is to look at what the children's connections are. I want to ask you, this case reminds me of why it's a good thing that I'm in a federal court and don't have to do custody disputes. But when you're thinking about the well-being of the children, my idea is that children need both of their parents, and how much they realize that at age eight remains to be seen. But as they get older, I think that will become clearer to them. So should we throw into the mix at all that when the children are here in the United States, their father can't physically be present with them, but when they're in Panama, both of their parents can be present? There's two factors that come into that. One, I think whether both parents can be present in Panama or not, I think it will be if the children are sent back, I think that there's criminal proceedings that are pending there, so I'm not sure that the mother will be available. But with that said, also the— Well, so that's—I mean, if you think that's a good argument for why they should stay, I mean, the father has the same argument for why they should come back. Well, I think that—so if the court affirms the district court's decision, that doesn't mean that the father doesn't have the ability to petition for custody in the United States, to petition the United States court. All that says is that the United States court in Florida would have the jurisdiction to make the decision of what the custodial rights are, what the timesharing is. The court in Florida would have the jurisdiction to say that the children need to move— or I'm sorry, that the children need to go to Panama to visit the father. Well, let me ask you this. The district court ended up by saying that the Florida state court would have jurisdiction, but it had no business saying that, right? Whether a Florida circuit court has jurisdiction to the exclusion of a Panamanian court on custody is not a matter for the district court to decide under the Hague Convention, right? I believe—well, it references—it gets into ICARA, which has to do with the fact that the children have been in the state of Florida for at least six months. So I do believe that the state of Florida would have jurisdiction over this case if the— But not necessarily to the exclusion of a Panamanian court. A Panamanian court could well decide that the children were illegally taken from here and we're going to continue custody proceedings and do it on its own too. Yes, Your Honor. In summary, based on the numerous factual findings, I believe that the overwhelming evidence supported that the factual findings met each factor, and there's been no showing that these factual findings were clear error. The court chose not to exercise her discretion. She had a very thorough, well-reasoned order on why she did not do that, and therefore we ask this court to affirm the district court ruling. Thank you for your time. Thank you. All right, just a few points on rebuttal. First, the court in Ruiz v. Tenurio in 2004, this court found that the district court's finding of facts should be reviewed for clear error. However, the ultimate conclusions that the children are well settled are reviewed de novo. And then moving on to the forgery of the letter, the district court did not make any findings as to the forgery of the letter, although at trial we believe that there's overwhelming evidence that the letter was forged. Your colleague says that the district court at least made a passing reference to believing that the mother had not submitted the so-called forged letter. Did the district court, in your recollection, make any such statement or not? I don't have a recollection of that. However, we do know that the mother testified that she did not have the authorization of the father when she crossed the border, and we've also presented evidence that the Panamanian immigration requirement requires a signed signature from the parent when crossing the border if the parent is not present. How did the letter come into your client's hands? I mean, through the Panamanian immigration authorities, right? Yes, Your Honor. One of the attorneys that he hired in Panama petitioned to obtain that letter, and that letter allowed the Panamanian courts to recognize that the children had crossed the border because until then it was thought that the children were still in Panama. Was the obligation on the part of the Panamanian authorities not to allow a child out of the country without the consent of both parents, did that exist in prior law, or was that a result of the court determination having been conveyed to the Panamanian immigration authorities? Your Honor, is your question if the exit order was in place at the time she crossed the border? Right. Well, there was an order in place at the time she crossed the border, right? Yes, Your Honor. That actually was put in place in January 2013, and she crossed the border in February of 2014. So that's the basis upon which you're saying that they needed to have proof of consent? Your Honor, that is correct. However, most countries, including Panama, when a single parent travels to an outside country without the other parent, they need written signature. That is very common in most countries that you travel to. Even absent any dispute or any court intervention? Yes, Your Honor. That's my understanding. Okay. I think that's what Judge Walker was asking you, whether or not there's Panamanian law to that effect absent the exit order in this case. Yes, Your Honor. We provided one of the plaintiff's exhibit, actually is a part of a website of Panamanian law that requires traveling parents to have that signature, and that is the case for every single parent that travels alone. Again, we're not asking— I'm sorry to digress, but even in the case of a married couple when one parent is traveling to see relatives somewhere else? I believe that's the case, Your Honor. Yes. And it's the case in a lot of countries. I mean, it's not the case here. You're talking about international? International traveling. Yes, Your Honor. That's the case in the United States? In a lot of countries that you're leaving to, yes. It depends on the country you are leaving to and their laws. But Panama has a law that says if you're a single parent traveling with— No, that's what I mean. Single parent. But I'm talking—it doesn't apply across the board, right? In other words, if you're a married couple and the parents of the two spouses live in different countries and one parent is taking a one-week vacation to a neighboring country to see grandparents, is it your understanding that that Panamanian provision applies in that scenario too? Yes, Your Honor, and Judge Covington testified— not testified, but discussed that at trial, that she also had to do that when she was traveling outside the country. These were not—the couple here was not married, is that correct? No, they were never married. And again, we're not asking you to rewrite the treaty. We're asking you to find that under these particular facts that the children should be returned so that the custody proceedings that started in 2009 between the parties can resume. Thank you. Thank you.